# Exhibit 3

1                    CAUSE NO. 2014-13621

2    SCHLUMBERGER LIMITED AND   ) IN THE DISTRICT COURT
     SCHLUMBERGER TECHNOLOGY    )
3    CORPORATION,               )
                                )
4           PLAINTIFF(S),       )
                                )
5    VS.                        ) HARRIS COUNTY, TEXAS
                                )
6    CHARLOTTE RUTHERFORD,      )
                                )
7           DEFENDANT(S).       ) 127TH JUDICIAL DISTRICT

8    *********************************************************

9               ORAL AND VIDEOTAPED DEPOSITION OF

10                   CHARLOTTE RUTHERFORD

11                      MAY 29, 2014

12                     Volume 1 of 1

13   *********************************************************

14       ORAL AND VIDEOTAPED DEPOSITION of CHARLOTTE

15   RUTHERFORD, produced as a witness at the instance of the

16   Plaintiffs, and duly sworn, was taken in the above-styled

17   and numbered cause on May 29, 2014, from 9:07 a.m. to

18   5:38 p.m., before Tammy S. Brown, CSR in and for the State

19   of Texas, reported by machine shorthand, at the offices of

20   AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING, P.C.,

21   One Houston Center, 1221 McKinney Street, Suite 3460,

22   Houston, Texas, pursuant to the Texas Rules of Civil

23   Procedure and the provisions stated on the record.

24

25

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF(S) SCHLUMBERGER LIMITED AND SCHLUMBERGER
     TECHNOLOGY CORPORATION:
 3        Mr. Maximilian A. Grant
          LATHAM & WATKINS LLP
 4        555 Eleventh Street, N.W., Suite 1000
          Washington, D.C.  20004-1304
 5        202.637.2200
          max.grant@lw.com
 6
          Mr. Andrew J. Fossum
 7        LATHAM & WATKINS LLP
          811 Main Street, Suite 3700
 8        Houston, Texas  77002
          713.546.5400
 9        andrew.fossum@lw.com

10        Mr. Craig Smyser
          Mr. Garland "Land" D. Murphy, IV
11        SMYSER KAPLAN & VESELKA, L.L.P.
          Bank of America Center
12        700 Louisiana Street, Suite 2300
          Houston, Texas  77002
13        713.221.2300
          csmyser@skv.com
14        lmurphy@skv.com

15        Ms. Paula Whitten-Doolin
          Intellectual Property Enforcement Counsel
16        SCHLUMBERGER SERVICES, INC.
          5599 San Felipe Street, 16th Floor
17        Houston, Texas  77056-2790
          713.375.3586
18        pwhitten-doolin@slb.com

19        Ms. Robin C. Nava, P.E.
          Deputy General Counsel - Intellectual Property
20        SCHLUMBERGER LIMITED
          5599 San Felipe Street, 17th Floor
20        Houston, Texas  77056-2790
          713.375.3519
21        rnava@slb.com

22

23

24

25
```

```
 1                      APPEARANCES CONTINUED

 2   FOR THE DEFENDANT(S) CHARLOTTE RUTHERFORD:
          Mr. Joseph Y. Ahmad
 3        Mr. Timothy C. Shelby
          AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING, P.C.
 4        One Houston Center
          1221 McKinney Street, Suite 3460
 5        Houston, Texas  77010
          713.655.1101
 6        joeahmad@azalaw.com
          tshelby@azalaw.com
 7
          Mr. Ashish Mahendru
 8        MAHENDRU P.C.
          739 Heights Boulevard
 9        Houston, Texas  77007
          713.571.1519
10        amahendru@thelitigationgroup.com

11        Mr. Richard B. Specter
          CORBETT, STEELMAN & SPECTER, PLC
12        18200 Von Karman Avenue, Suite 900
          Irvine, California  92612
13        949.553.9266
          rspecter@corbsteel.com
14
     FOR DYNAMIC 3D GEOSOLUTIONS LLC:
15        Mr. Michael Collins
          COLLINS, EDMONDS, POGORZELSKI, SCHLATHER &
16        TOWER, PLLC
          1616 S. Voss Road, Suite 125
17        Houston, Texas  77057
          281.501.3490
18        mcollins@cepiplaw.com

19   ALSO PRESENT:
          Mr. Johnny Spencer - The Videographer
20

21

22

23

24

25
```

1                                    INDEX

2                                                               Page
       Appearances.................................    2
3      Stipulations...............................    6

4      CHARLOTTE RUTHERFORD

5      By Mr. Grant...............................    8
       By Mr. Ahmad............................... 273
6
       Changes and Signature...................... 275
7      Reporter's Certificate..................... 277

8                                  EXHIBITS

9      No.           Description                      Page
       Exhibit 1     Defendant's Anti-SLAPP Motion
10                   to Dismiss....................    11
       Exhibit 2     Plaintiffs' Original
11                   Petition, Ex Parte
                     Application for Temporary
12                   Restraining Order, Temporary
                     Injunction, and Permanent
13                   Injunction and Motion of
                     Expedited Discovery...........    45
14     Exhibit 3     United States Patent
                     US 7,986,319 B2...............    52
15     Exhibit 4     Original Complaint for Patent
                     Infringement..................    76
16     Exhibit 5     LinkedIn Profile of Charlotte
                     Rutherford.................... 110
17     Exhibit 6     Performance Appraisal and
                     Development Plan - Charlotte
18                   Rutherford
                     (SLB 00000460 - 467).......... 159
19     Exhibit 7     Cover Page - "Intellectual
                     Property Strategy" -
20                   Presented by Charlotte
                     Rutherford - Deputy General
21                   Counsel IP - 17 Jan 2011 -
                     Schlumberger Secret........... 177
22     Exhibit 8     Declaration of David Cowen..... 182
       Exhibit 9     June 3, 2013 Acacia Press
23                   Release....................... 233
       Exhibit 10    December 9, 2013 Acacia Press
24                   Release....................... 240

25

EXHIBITS

No.          Description                        Page

Exhibit 11   Schlumberger Patent and
             Confidential Information
             Agreement.....................   247
Exhibit 12   Schlumberger Business and
             Employee Conduct Policy
             Statement.....................   248
Exhibit 13   Schlumberger Confidentiality
             and Information Security
             Policy........................   249
Exhibit 14   Schlumberger Data Privacy and
             Protection Policy.............   250
Exhibit 15   Schlumberger Conflict of
             Interest Policy...............   250
Exhibit 16   Schlumberger Inventions
             Ownership and Confidential
             Information Policy............   251
Exhibit 17   "Schlumberger - Our Values,
             Conduct, and Behavior" .......   251
Exhibit 18   Schlumberger Code of Conduct...  252

```
 1                    THE VIDEOGRAPHER:  Tape 1, on the record at
 2   9:07.
 3                    CHARLOTTE RUTHERFORD,
 4   having been first duly sworn, testified as follows:
 5                    THE REPORTER:  Pursuant to the Texas Rules?
 6                    MR. AHMAD:  Yes, and she will read and sign.
 7                    And then we -- we have some people here who
 8   we probably need to formalize that they agree to the
 9   existing protective order in this case that applies.
10                    On our side, we have Michael Collins here,
11   who I understand is Counsel to Dynamic 3D, and I'll let
12   him make his statement about agreeing to the protective
13   order.
14                    MR. COLLINS:  Yes.  For the record, my name
15   is Michael Collins.  I represent Dynamic 3D Geosolutions,
16   LLC, and I do agree to be bound by the protective order in
17   -- in this State Court case.
18                    MR. AHMAD:  And then, Max, I know your
19   pro hoc is -- is pending.  I can't imagine that it would
20   be denied, but -- but while it's pending, you, too, agree
21   to the protective order?
22                    MR. GRANT:  Of course, I do.  And why don't
23   we put everybody's appearances on the record.
24                    So, I'm Max Grant, Latham & Watkins, on
25   behalf of Schlumberger.  With me is my colleague, Andrew
```

```
 1    Fossum, and my Co-Counsel, Craig Smyser and Land Murphy,

 2    as well as Schlumberger representatives, Robin Nava and

 3    Paula Doolin-Whitten.

 4              MR. AHMAD:  And on my side, obviously,

 5    Charlotte Rutherford is the witness.  I'm Joe Ahmad.  I

 6    represent Charlotte Rutherford together with Tim Shelby,

 7    Ashish Mahendru and Richard Specter, who is seated at the

 8    end.

 9              MR. GRANT:  Okay.  Terrific.

10              MR. SMYSER:  Richard, has your pro hoc been

11    granted?

12              MR. SPECTER:  I believe it has, yes.

13              MR. SHELBY:  Yes.

14              MR. SPECTER:  At the last --

15              MR. SMYSER:  I -- I just couldn't remember.

16    I knew it had been filed.

17              MR. AHMAD:  He agrees to the protective

18    order, but I think -- I think it was granted.

19              MR. SMYSER:  And you agree to the protective

20    order?

21              MR. SPECTER:  Yes and yes.

22              MR. SMYSER:  Thank you.

23              MR. SHELBY:  Can we get the same for the

24    in-house lawyers, I don't think they've formally entered

25    appearances.
```

1            MS. WHITTEN-DOOLIN:  Paula Whitten-Doolin for

2   Schlumberger, and I'll agree to be bound by the protective

3   order to the extent that I need to do so.

4            MS. NAVA:  Robin Nava, Schlumberger, and I

5   agree to be bound by the protective order.

6            MR. SHELBY:  Thank you.

7            MR. GRANT:  Okay.  And I apologize, Madam

8   Court Reporter, have we sworn the witness?

9            THE REPORTER:  (Nodded head.)

10           MR. GRANT:  Terrific.

11                        EXAMINATION

12  BY MR. GRANT (9:09):

13    Q.   Ms. Rutherford, my name is Max Grant.  Can you,

14  please, give us your full name for the record.

15    A.   Charlotte Howell Rutherford.

16    Q.   Okay.  Now, we both represented Schlumberger back

17  before you joined Acacia, but I'm not sure we had the

18  opportunity to meet then.  So I'm an attorney with Latham,

19  and I'm representing Schlumberger today.  I wanted to

20  introduce myself.

21           As I understand, we're here for the limited

22  purpose, pursuant to Judge Sandill's order, to address

23  issues related to your, Defendant's, Anti-SLAPP Motion.

24           You're an attorney, correct?

25    A.   I am.

1    Q.   Okay.  Do you understand what privileged

2  information is?

3    A.   I do.

4    Q.   Okay.  And you understand what attorney work

5  product information is?

6    A.   I do.

7    Q.   Okay.  Now, do you understand that during the

8  time that you represented Schlumberger, the privilege and

9  the protection accorded to work product, that belongs to

10  the client, the company, Schlumberger?  Do you understand

11  that?

12    A.   I do.

13    Q.   Okay.  So, as Schlumberger's Counsel, I'm

14  requesting that you, as former Counsel for Schlumberger,

15  that with regard to my questions today, I'm not seeking

16  the substance of any privileged or work product

17  information.

18          And on behalf of Schlumberger, I'm directing

19  you to not to disclose, in this deposition, any privileged

20  Schlumberger information in response to my questions; to

21  the extent I'm asking for things like that, I'll be asking

22  for topics, not for the substance of any information.

23          But if you believe a question calls for the

24  disclosure of Schlumberger privileged information, then

25  I'm directing you to let me know and not disclose it, and

1    whose name you don't recall?

2        A.   No, I don't.

3        Q.   Okay.  Who are your colleagues at Acacia?

4        A.   Acacia has a number of employees.

5        Q.   Who are your colleagues at Acacia,

6    Ms. Rutherford?

7        A.   Well, by "colleagues," I assume you mean

8    employees?

9        Q.   Just answer the question to the best of your

10   ability.

11       A.   Well, if you mean colleagues to be employees at

12   Acacia, Acacia has approximately 60 employees.

13       Q.   Are they all your colleagues?

14       A.   I would regard them as my colleagues, yes.

15       Q.   Is Gary Fischman one of your colleagues?

16       A.   Yes, he is.

17       Q.   Is Stephen Bonner one of your colleagues?

18       A.   Stephen Bonner does not work for Acacia.

19       Q.   Okay.  Who does he work for?

20       A.   I understand Stephen Bonner's retired.

21       Q.   Okay.  Did he work for Acacia?

22       A.   He did at one time.

23       Q.   When?

24       A.   Stephen Bonner worked for Acacia in 2013.

25       Q.   Can you give me the time frame?

1        A.    The second half of 2013.

2        Q.    Did you hire him?

3        A.    I -- Acacia did hire Stephen Bonner.

4        Q.    Did you hire him?

5              MR. AHMAD:  Object to the form.

6        A.    Again, I don't hire; Acacia hires.

7        Q.    (BY MR. GRANT)  Okay.  Did he work in your

8    office?

9        A.    He worked in my office, yes.

10       Q.    Were you involved in his recruitment?

11       A.    Yes, I was involved in his recruitment.

12       Q.    Were you the first person that reached out to him

13   to try to get him to come work at Acacia?

14             MR. AHMAD:  Object to the form.

15       A.    No, I was not.

16       Q.    (BY MR. GRANT)  Who was?

17       A.    A recruiter.

18       Q.    Were you the first Acacia employee that spoke to

19   him about his potential employment at Acacia?

20       A.    Yes, I was.

21       Q.    How many colleagues work in your Houston facility

22   here?

23             MR. AHMAD:  Object to the form.

24       A.    In the Houston office, I have one, two, three --

25   four colleagues or employees who work in the Houston

```
 1   office.
 2       Q.   (BY MR. GRANT)   What are their names?
 3       A.   Their names are Vincent Varghese.   V-A --
 4            THE WITNESS:   Would you like me to spell it?
 5       A.   V-A-R-G-H-E-S-E.   Gary Fischman, F-I-S-H-M-A-N.
 6   Phillip Mitchell, and Debra Hexsel, H-E-X-S-E-L.
 7       Q.   (BY MR. GRANT)   Who is the senior person in
 8   Acacia's Houston office?
 9       A.   I am.
10       Q.   Do --
11       A.   If you mean senior by rank, as opposed to
12   something else.
13       Q.   Who is in charge of the Houston office?
14       A.   I am in charge of the Houston office.
15       Q.   Do those four employees report to you?
16       A.   They report to me; but some of them also have a
17   dual reporting to other people, as well --
18       Q.   I understand --
19       A.   -- in Acacia.
20       Q.   I understand that there may be some dual
21   reporting; but each and every one of those people report
22   to you in at least one capacity, correct?
23            MR. AHMAD:   Object to the form.
24       A.   Yes, they do.
25       Q.   (BY MR. GRANT)   So, Gary Fischman, for example,
```

1   reports to you?

2              MR. AHMAD:   Object to the form.

3        A.   Gary Fischman reports to me, but he also has

4   another reporting responsibility, as well.

5        Q.   (BY MR. GRANT)   Did you associate with Acacia

6   for the purpose of suing Schlumberger?

7        A.   No, I did not.

8        Q.   The -- you referred to this person who is the

9   director of Dynamic 3D whose name you didn't recall.

10       A.   Uh-huh.

11       Q.   Have you had any communications with that person

12  regarding the subject matter of the 3D versus Schlumberger

13  lawsuit?  Yes or no?

14       A.   No, I have not.

15       Q.   Have you spoken with -- have you had any

16  communications with Mr. Fischman regarding the subject

17  matter of the Dynamic 3D versus Schlumberger lawsuit?

18              MR. AHMAD:   I'll object --

19              MR. GRANT:   "Yes" or 'no."

20              MR. AHMAD:   Okay.  Subject to that being

21  answered "yes" or "no," that's fine.

22       A.   Yes, I have.

23       Q.   (BY MR. GRANT)   What was the substance of those

24  communications with Mr. Fischman regarding the Dynamic 3D

25  versus Schlumberger lawsuit?

```
 1              MR. COLLINS:  Objection, calls for
 2   information protected by the attorney/client privilege,
 3   also calls for attorney work product.
 4              MR. AHMAD:  I will join in that -- well,
 5   actually, hang on.  If she answers that question, will you
 6   agree that that doesn't constitute a waiver?
 7              MR. GRANT:  No.  No subject matter waiver,
 8   correct.
 9              MR. AHMAD:  I'm sorry?
10              MR. GRANT:  It will not constitute a subject
11   matter waiver.
12              MR. AHMAD:  It -- if it's not a waiver of the
13   attorney/client or attorney work product, I'm inclined to
14   answer that.  If it's -- and we're talking about
15   Schlumberger, correct?
16              MR. GRANT:  Yes.
17              MR. AHMAD:  Okay.
18              MR. GRANT:  I mean, it's -- it's obviously a
19   waiver of what she's saying, but it's not -- that
20   statement is not a basis to claim a broader waiver.
21              MR. AHMAD:  Well, I don't want -- I want an
22   agreement that it's not a waiver of anything.
23              MR. GRANT:  Okay.
24              MR. AHMAD:  Okay?
25              MR. GRANT:  Sure.
```

1    decided to acquire the '319 Patent after you joined it,

2    correct?

3        A.    That is correct.

4        Q.    And Acacia decided to assert the '319 Patent

5    against Schlumberger after you had joined Acacia, correct?

6        A.    Yes.

7        Q.    What's the approximate date that you first saw

8    any version of this complaint, Exhibit 4?

9        A.    The first time that I read this complaint against

10   Schlumberger by Dynamic 3D was after it had been filed.

11       Q.    When was the first time you saw any version of

12   the complaint that Dynamic 3D filed against Halliburton?

13       A.    I would -- I would say within a couple of days of

14   the complaint being filed against Halliburton, as I can

15   best recall.

16       Q.    Aren't the complaints against Schlumberger and

17   Halliburton substantially identical?

18              MR. COLLINS:  Object to form.

19              MR. AHMAD:  I'll -- I'll join in that

20   objection.

21       A.    I know they both alleged patent infringement of

22   the '319.

23       Q.    (BY MR. GRANT)  Well, you've read both.  Can you

24   answer my question?  Isn't it true, Ms. Rutherford, that

25   the complaints filed by Dynamic 3D against Halliburton

1    and against Schlumberger are substantially identical?

2          MR. COLLINS:  Same objection.

3          MR. AHMAD:  Object to the form.

4    A.   I would say they're similar.

5    Q.   (BY MR. GRANT)  Very similar, right?

6          MR. AHMAD:  Object as to form.

7    A.   Again, I would say they're similar.

8    Q.   (BY MR. GRANT)  Now, in terms of the Halliburton

9    complaint, I think -- well, let me ask it this way.  Were

10   you involved in drafting the Halliburton complaint?

11    A.   No, I was not.

12    Q.   Now, you said that you reviewed it.  I want to

13   make sure I've got this clear on the record.  Did you

14   provide any edits, "yes" or "no," to the Halliburton

15   complaint?

16    A.   No, I did not.

17    Q.   Can you describe for me your involvement in the

18   decision to acquire the '319 Patent by Acacia?

19         MR. COLLINS:  Objection, calls for

20   information protected by the attorney/client privilege and

21   attorney work product doctrine.

22         MR. AHMAD:  Max, do you mind if I confer with

23   the client about that?

24         MR. GRANT:  Not at all.

25         MR. AHMAD:  Okay.  Thanks.

```
 1                    THE VIDEOGRAPHER:   Tape 2, off the record at
 2    10:53.
 3                    (Recess from 10:53 a.m. to 11:06 a.m.)
 4                    THE VIDEOGRAPHER:   Tape 3, on the record,
 5    11:06.
 6                    MR. GRANT:   We had a pending question, Madam
 7    Court Reporter.   Could you, please, re-read it?
 8                    (Requested portion was read)
 9                    MR. AHMAD:   And subject to an agreement with
10    Counsel that that will not constitute a waiver,
11    Ms. Rutherford can answer that question.
12                    MR. GRANT:   That's fine.
13        A.    So, my involvement was to concur with the
14    recommendation to acquire the '319 Patent.
15        Q.    (BY MR. GRANT)   Whose recommendation?
16        A.    Outside Counsel and Gary Fischman, my Licensing
17    Executive IP Counsel, along with the engineer, Phil
18    Mitchell.
19        Q.    Okay.  So, you -- you received recommendations
20    from the Collins Edmonds firm, from Mr. Fischman and from
21    Mr. Mitchell to acquire the patent, correct?
22        A.    Yes.  Mr. Mitchell was working at the direction
23    of Counsel.
24        Q.    Which Counsel?
25        A.    He was working at the direction of both outside
```

1    Counsel and in-house Counsel.

2        Q.    Okay.  Which in-house Counsel was he working at

3    the direction of?

4        A.    Again, Gary Fischman, the Licensing Executive IP

5    Counsel.

6        Q.    Okay.  And -- and -- and that was your Licensing

7    IP Executive, right?

8                MR. AHMAD:  Object to the form.

9        Q.    (BY MR. GRANT)  Right?  He's -- he works for

10   you?

11       A.    He works for me, and he also reports to someone

12   else at Acacia.

13       Q.    Did they provide you with a -- any one of them

14   provide you with a presentation?

15                MR. AHMAD:  And can we have the same

16   non-waiver agreement?

17                MR. GRANT:  Yeah.  I'm just trying to find

18   out what would be in a privileged log anyway.  So, I'm --

19   I'm not sure it applies, but I'm not arguing subject

20   matter waiver based on her answer.

21                MR. AHMAD:  I'm not -- I'm just trying to

22   make it easy --

23                MR. GRANT:  Sure.

24                MR. AHMAD:  -- because I'm not necessarily

25   saying there is a privilege, but I want to make it easy

1      and just agree that we're not waiving any, if it exists.

2                      MR. GRANT:   That's -- that can apply for the

3      whole day.

4                      MR. AHMAD:   Okay.   You can -- you can go

5      ahead and answer that question subject to our non-waiver

6      agreement.

7          A.    Would you, please, repeat the question?

8          Q.    (BY MR. GRANT)  Did they make a presentation,

9      any one of those three, to you?

10         A.    Presentation was made by outside Counsel.

11         Q.    Okay.   Again, was that PowerPoint?

12         A.    Yes.

13         Q.    Okay.   How long did that presentation last?

14         A.    As best I recall, it was about an hour.

15         Q.    Okay.   Was Schlumberger referenced in that

16     presentation?

17         A.    Yes.

18         Q.    Let's go back, if we can, briefly, to the first

19     meeting with Austin GeoModeling.  Do you have that one in

20     mind?

21         A.    Okay.

22         Q.    Okay.   The two inventors were there, correct?

23         A.    Correct.

24         Q.    And, then, there was a Mr. Schneider, who is a

25     Licensing Executive, correct?

1       A.    He's a License Executive and IP Counsel.

2       Q.    Okay.  And a Mr. A-- Ahorn?

3       A.    Ahroon.

4       Q.    Ahroon?

5       A.    Eric Ahroon.

6       Q.    And he's a business development person?

7       A.    He is.

8       Q.    Okay.  And Mr. Mitchell, the engineer, was there?

9       A.    Yes.

10      Q.    And you were there?

11      A.    Yes.

12      Q.    Okay.  Did either -- did you provide any legal

13  advice to Austin GeoModeling at that first meeting?

14      A.    I don't recall that I did.

15      Q.    Okay.  Did Mr. Schneider provide any legal advice

16  to Austin GeoModeling at that first meeting?

17      A.    I believe he did.

18      Q.    Well, what was the -- what was the -- the topic,

19  privilege log level description, of the legal advice he

20  was providing?

21              MR. AHMAD:  And --

22              MR. COLLINS:  I'm -- I'm going to object that

23  that calls for material -- or information covered by the

24  attorney/client privilege and the attorney work product

25  doctrine.

```
 1         A.    No, I don't recall I did.

 2         Q.    You didn't receive a copy of the transcript,

 3    correct?

 4         A.    I -- I don't recall receiving a copy of the

 5    transcript, no.

 6         Q.    And you never spoke to Mr. Fischman about what

 7    occurred at that hearing, correct?

 8         A.    Mr. Fischman told me that a hearing took place.

 9         Q.    My question, Ms. Rutherford, was:  Did you have a

10    conversation with Mr. Fischman about what occurred at the

11    hearing?

12              MR. AHMAD:  That's a "yes" or "no."

13         A.    No.

14         Q.    (BY MR. GRANT)  Can you give me a list of names

15    of people at the Collins Edmonds firm with whom you've

16    spoken to regarding the litigation pending in Austin,

17    either the lawsuit with -- regarding Halliburton or the

18    lawsuit regarding Schlumberger?

19         A.    Can you repeat the question, please?

20         Q.    Sure.  I would like the names of any attorneys at

21    the Collins Edmonds firm with whom you've spoken to on the

22    topic of the litigation before Judge Yeakel.

23              MR. COLLINS:  Object to form.  Which

24    litigation are you talking about, Counsel?

25              MR. GRANT:  Both of them.
```

```
 1        A.    Well, that's why I'm confused.  Your second
 2   question spoke to the litigation in front of Yeakel.
 3        Q.    (BY MR. GRANT)  Yes, the one that's consolidated
 4   for marketing purposes.  So at least for now, it appears
 5   to be a single litigation.
 6              MR. COLLINS:  No, there are two lawsuits,
 7   Counsel.  Which one?
 8        Q.    (BY MR. GRANT)  I want to know --
 9              MR. FOSSUM:  Either.
10        Q.    (BY MR. GRANT)  -- either.  What are the names
11   of the people you've spoken with at Collins Edmonds
12   regarding either of those lawsuits?
13              MR. COLLINS:  Object to form.
14        A.    So, I'm going to try to clarify your question,
15   and if I don't understand it, please tell me.  As to the
16   '319 litigation currently pending, I have not spoken to
17   people at the Collins firm concerning that.
18              Those discussions occur between the attorneys
19   at the Collins firm and my Licensing Exec IP Counsel, Gary
20   Fischman.
21        Q.    (BY MR. GRANT)  Okay.  So, is it your testimony,
22   Ms. Rutherford, that you've never been involved in any
23   discussion or communication with anyone at the Collins
24   Edmonds firm concerning the subject matter of either
25   lawsuit filed by 3D GeoModeling (sic)?
```

```
 1              MR. COLLINS:  Object to form.  You can answer
 2   if you understand the question.
 3        A.   I don't understand the question, so I -- I cannot
 4   answer it.  Can you rephrase it?  And could you do me a
 5   favor and split the two litigations up, because I get
 6   confused when you put them both in the same question.
 7        Q.   (BY MR. GRANT)  Well, I'm trying to simplify, so
 8   let's keep them both --
 9        A.   Well, don't simplify it, then.  Just clarify it
10   for me, please.
11        Q.   I'll keep them both in the same question.  Are
12   there -- or is it your testimony that you've spoken with
13   no one at the Collins Edmonds firm about any lawsuit in
14   which the '319 Patent was asserted?
15              MR. COLLINS:  Object to the form.
16        A.   I previously testified that I have been involved
17   in a conversation with someone from the Collins firm in a
18   presentation concerning the '319 Patent.  I've already
19   testified to that.
20        Q.   (BY MR. GRANT)  Okay.  Well, you testified about
21   that conversation that you had with them where they made
22   the recommendation to acquire and sue, correct?
23        A.   Yes.
24        Q.   Okay.  So, that one you were clearly involved in.
25   And who, other than Mr. Collins, participated in those
```

1    considered?

2        A.    I did not provide input.

3        Q.    Were your views considered?

4        A.    I don't recall expressing any views.

5        Q.    Okay.  So, you didn't provide any input and

6    nobody solicited your input on the terms of the

7    transaction.  Is that what you're saying?

8        A.    As best I can recall.

9        Q.    Okay.  Can you tell me what you know about the

10   terms of the transaction in which Acacia acquired rights

11   to the '319 Patent?

12            MR. AHMAD:  I'm going to object as to

13   attorney/client privilege, common interest privilege and

14   attorney work product.  Instruct you not to answer.

15            MR. COLLINS:  And same objection and same

16   instruction -- instruction.

17       Q.    (BY MR. GRANT)  Are you going to follow that

18   instruction?

19       A.    I am.

20            MR. GRANT:  Okay.  So you guys are asserting

21   that the terms of the deal themselves are privileged?

22   Okay.

23       Q.    (BY MR. GRANT)  Was there a -- "yes" or "no" -- a

24   valuation of the patent that was conducted either by

25   Acacia or its agents?

1       A.    Yes.

2       Q.    Okay.   Did you see that?   Have access to it?

3       A.    I don't recall seeing it.

4       Q.    Who did that valuation?   Was it done internally

5   at Acacia or by the Collins Edmonds firm?

6              MR. AHMAD:   Object to the form.

7       A.    I did not participate, so I don't know the answer

8   to your question.

9       Q.    (BY MR. GRANT)   Was the valuation of the '319

10  Patent included in the presentation that was made to you

11  regarding the decision whether to acquire and assert the

12  patent?

13      A.    I don't --

14             MR. AHMAD:   Object to the form.

15      A.    I don't recall.

16      Q.    (BY MR. GRANT)   Other than Mr. Fischman, who at

17  Acacia is interacting or has had any communications with

18  the Collins Edmonds firm regarding the '319 Patent

19  litigation?

20      A.    To the best of my knowledge, it's Gary Fischman.

21      Q.    Okay.   To the best of your knowledge, nobody else

22  at Acacia is interacting with the Collins Edmonds firm.

23  Is that right?

24             MR. AHMAD:   Objection, form.

25      A.    Well, I -- I am aware that the inventors have

```
 1    discussions with Mike Collins, but, again, they're not at

 2    Acacia, right?

 3        Q.   (BY MR. GRANT)  And I'm talking about Acacia.

 4        A.   Uh-huh.

 5        Q.   Okay.

 6        A.   And -- and I would like to add to that, Phil

 7    Mitchell, who is at Acacia and who is an engineer.

 8        Q.   So, Mr. Mitchell is an engineer; he doesn't

 9    provide any legal advice, does he?

10        A.   He's an engineer.

11        Q.   He doesn't provide any legal advice, does he?

12             MR. AHMAD:  I'm -- I'm going to object to

13    form.

14        Q.   (BY MR. GRANT)  Well, he works for you.  Are you

15    aware of him providing any legal advice in the conduct of

16    his duties?

17        A.   No.

18             MR. AHMAD:  Same objection.

19        Q.   (BY MR. GRANT)  No.  Okay.

20             Is Mr. Fischman responsible for the

21    strategy and conduct of the '319 Patent litigation?

22             MR. AHMAD:  I'll object as to form.

23        A.   On behalf of Acacia.

24        Q.   (BY MR. GRANT)  Yeah, the client.  Who's the

25    client?
```

1        A.    The client is Dynamic 3D.

2        Q.    Okay.  And who is the person who's directing the

3    litigation on behalf of Dynamic 3D?  What's their name?

4        A.    I see it being outside Counsel and Gary Fischman.

5        Q.    Okay.  Is there anybody other than Gary Fischman,

6    putting aside outside Counsel --

7        A.    Uh-huh.

8        Q.    -- who's responsible for the conduct of the

9    litigation on behalf of Dynamic 3D?

10       A.    Well, Gary Fischman, now, also reports to Jaime

11   Siegel.  S-I-E-G-E-L, I think, is the spelling.

12       Q.    Yeah, I appreciate that.  Maybe I'm not

13   understanding your answer.

14             My question isn't who does he report to, my

15   question is who at Acacia is responsible for conduct of

16   the litigation.  Is it your answer that Mr. Siegel is also

17   responsible?

18             MR. AHMAD:  Hang -- hang on for a second.

19   Just so the record is clear, I -- I think we've left the

20   bounds of this lawsuit and the -- the Anti-SLAPP Motion --

21             THE WITNESS:  Uh-huh.

22             MR. AHMAD:  -- and we're going into, I -- I

23   think, issues related to your disqualification motion in

24   the Austin lawsuit, you know.

25             So unless there's some relevance here -- you

 1   know, I've let it continue for a while -- but unless

 2   there's some relevance here, I'm going to have to object

 3   this is just harassing the witness.

 4           MR. GRANT:   Yeah.   It's nothing close to

 5   harassing the witness.   The relevance is that a violation

 6   of ethical duties is one of the exclusions of conduct that

 7   might arguably otherwise be protected by the Anti-SLAPP

 8   Statute.

 9           So what I'm trying to do is determine exactly

10   what her involvement is and understand where those bounds

11   are.

12           MR. AHMAD:   And -- and I think --

13           MR. GRANT:   And if you want to instruct the

14   witness not to answer, you can do that --

15           MR. AHMAD:   I haven't done that, yet.

16           MR. GRANT:   -- but -- but I'm going to ask

17   that question.

18           MR. AHMAD:   And that's a fine question.   I

19   think we're going into other people's conduct.   So, I

20   mean, I'll let it continue, but at some point, this is

21   clearly beyond the Anti-SLAPP Motion.

22           MR. GRANT:   And we disagree.

23           MR. COLLINS:   We're --

24           MR. GRANT:   I'm -- I'm entitled to know who's

25   responsible, if it's not her, and all I'm trying to do is

1    for a time, by Acacia, itself, correct?

2        A.   I don't know.  I know that the '319 was assigned

3    to Dynamic 3D.  That was handled by Gary.

4        Q.   From where was it assigned?

5        A.   From Austin Geo.

6        Q.   So, to your knowledge, you don't have any

7    knowledge as to whether Acacia owned the patent in between

8    its ownership by Dynamic 3D and Austin GeoModeling?

9        A.   I don't know.

10       Q.   Okay.

11       A.   That was handled, again, by Gary Fischman.

12       Q.   Is the -- the '319 Patent an asset of the energy

13   practice?

14       A.   It's an asset of Dynamic 3D.

15       Q.   Yes.  And -- and I'd appreciate a "yes/no"

16   answer.  Is it an asset of the energy practice at Acacia?

17       A.   Energy practice is a group of people.  It's not a

18   legal entity.

19       Q.   Okay.

20                   (Exhibit No. 5 was marked.)

21                   THE WITNESS:  Thank you.

22                   MR. AHMAD:  Is this 5?

23                   MR. FOSSUM:  Yes.

24       Q.   (BY MR. GRANT)  Okay.  What's Exhibit 5,

25   Ms. Rutherford?

```
 1        A.    Exhibit 5 appears to be my profile on LinkedIn.

 2        Q.    Okay.  Did you input the data that is presented

 3   in Exhibit 5?

 4        A.    I did.

 5        Q.    The team of people that you assembled as it's

 6   referred to here in your LinkedIn profile, are those the

 7   people that you listed as being resident in the Acacia

 8   Houston office?

 9        A.    Which people are you referring to?

10        Q.    First paragraph, five lines down, I want you to

11   read the sentence that begins with "Charlotte has

12   assembled."

13        A.    Okay.  Charlotte has assembled a team of people

14   with the right kind of track record for success, their

15   having been successful in the energy space working for

16   companies such as Shell, Conoco, Schlumberger, Fluor and

17   Tenneco.

18        Q.    Who is the team of people that you assembled,

19   Ms. Rutherford?

20        A.    I'll repeat their names, I mentioned them

21   earlier:  And that's Vincent Varghese, Phil Mitchell, Gary

22   Fischman and Debra Hexsel.

23        Q.    Okay.  And beyond yourself, do any of those

24   people -- are any of those people ones who had worked for

25   Schlumberger?
```

1      A.   No.

2      Q.   Are there any people who worked in the Houston

3  office at any time while you were there who worked for

4  Schlumberger?

5      A.   Yes.

6      Q.   Who's that?

7      A.   Stephen Bonner.

8      Q.   Was Stephen Bonner involved in the evaluation or

9  acquisition of the '319 Patent?

10     A.   Not to my knowledge.

11     Q.   Was Stephen Bonner involved in any way in any

12 analysis relating to the '319 Patent litigations?

13     A.   Not to my knowledge.

14     Q.   Okay.  It says that prior to joining Acacia, you

15 held some executive positions.  Is that right?

16     A.   Yes, I did.

17     Q.   Were you -- were you an officer of Schlumberger?

18     A.   No, I was not.

19     Q.   But you did manage its global IP practice?

20     A.   Yes, I did.

21     Q.   Okay.  Now, did Stephen Bonner do work for Gary

22 Fischman?

23     A.   I'm sure he did.

24     Q.   Do you know if he worked at Mr. Fischman's

25 direction relating to the '319 Patent in any way?

Charlotte Rutherford

1    A.    I do not know.

2    Q.    Okay.  Just so we make sure we hit the high

3 points.  You got your law degree from Loyola, correct?

4    A.    Yes.

5    Q.    Okay.  And what State Bars are you a member of?

6    A.    Seven State Bars, some active and some inactive.

7    Q.    Which State Bars?  And if you can delineate which

8 ones are active, then --

9    A.    Sure.

10    Q.    -- I'd appreciate it.

11    A.    Sure.  Be glad to.  All right.  So New Jersey is

12 active.  Pennsylvania is inactive.  New York is active.

13 Colorado is inactive.  D.C. Circuit Court of Appeals is

14 active.  Texas is active.  Louisiana is inactive.

15    Q.    And the PTO?

16    A.    It's not a State Bar, but, yes, I am a member of

17 the U.S. Patent Trademark Office Bar.

18    Q.    How long have you been a member of the Texas

19 State Bar?

20    A.    My profile says -- so I'll have to rely on that

21 because I can't rely on memory alone -- it says 1988.

22    Q.    Okay.  And you reside in Texas, correct?

23    A.    I do.

24    Q.    Okay.  You were a, by this description, a senior

25 intellectual property attorney at Schlumberger from July,

1        Q.    Sure.  And that's a non-legal role, correct?

2        A.    The business development is.

3        Q.    Okay.  And you said the vast majority of what

4    you've done at Acacia is non-legal, because you've been

5    focusing on business development, correct?

6        A.    Vast majority of my time has been business

7    development.

8        Q.    What are the companies that you've spoken with in

9    your role in business development at Acacia since you've

10   been there?

11             MR. AHMAD:  Objection.  I think this is kind

12   of outside the scope of certainly the motion and the

13   lawsuit, and calls for trade secret information.  So, I'm

14   going to have to object -- and it's, for that reason, I

15   think harassing.

16             So, I would object and instruct her not to

17   answer unless there's some tie-in to this case or

18   Schlumberger.

19             MR. GRANT:  Yeah.  The -- the tie-in has to

20   do with the claims relating to fiduciary responsibility.

21   And since she's asserting that this has been the context

22   of her role, I'm trying to determine where it falls within

23   her ongoing obligations to Schlumberger.  So, if you want

24   to instruct her not to answer, that's fine.

25             MR. AHMAD:  I'm --

 1                    MR. GRANT:   But I'm -- that's the context to

 2    the extent you needed it.

 3                    MR. AHMAD:   I appreciate that, and I will

 4    instruct the witness not to answer.

 5         Q.   (BY MR. GRANT)   Okay.   Are you going to follow

 6    that instruction?

 7         A.   I am.

 8         Q.   Was the meetings that you had with Austin

 9    GeoModeling in your non-legal business development

10    context?

11         A.   My meetings with Austin Geo, I would not

12    understand that to be business development because Austin

13    Geo had already come to Acacia before I joined Acacia.

14    So, Austin Geo was trying to convince Acacia to partner

15    with them and acquire their patent to license it.

16         Q.   Okay.   Does that mean that your involvement in

17    the meetings with Austin GeoModeling were -- was in a

18    legal role?

19         A.   I would say, yes.

20         Q.   And the -- there's no doubt, is there, that the

21    presentation that you received from the Collins Edmonds

22    firm related to the '319 Patent litigation, that was

23    something that you received in a legal role, correct?

24         A.   I would say, yes.

25         Q.   Now, you were the Chief IP Counsel at

1    Schlumberger from 2009 to May, 2013, correct?

2        A.    My -- as I mentioned, my title varied.  It was

3    Director of Intellectual Property.  I think they -- after

4    the title changed, it was, then, Deputy General Counsel

5    for Intellectual Property.

6        Q.    When did that title change occur, approximately?

7        A.    I can't recall.

8        Q.    Did your responsibilities change when your title

9    changed?

10       A.    No, but my responsibilities changed while I was

11   in those roles.

12       Q.    While you served as Deputy General Counsel for

13   IP, and in the other roles that you served at

14   Schlumberger, you had access to all aspects of

15   Schlumberger's confidential and privileged information

16   regarding intellectual property, correct?

17              MR. AHMAD:  Objection, form.

18       A.    I would not characterize it that way.

19       Q.    (BY MR. GRANT)  You had access to Schlumberger

20   confidential and privileged information relating to the

21   company's technology development, right?

22              MR. AHMAD:  Objection, form.

23       A.    Again, I did not have access.  My Chief IP

24   Counsels or Managing IP Counsels, they had access to the

25   company's confidential information.  Them having access

```
 1    doesn't mean I have access.

 2        Q.    (BY MR. GRANT)  So, you're drawing a distinction

 3    between your direct reports having access to information

 4    and you.  Is that correct?

 5        A.    I am.

 6        Q.    Okay.  Did you have access to any Schlumberger

 7    confidential or privileged information regarding

 8    technology development?

 9        A.    Again, I -- I would -- if I had access, it would

10    be through my reports, what they decided to show me or not

11    show me, discuss with me or not discuss with me.

12        Q.    Is the answer to my question "yes" or "no,"

13    ma'am?

14        A.    I -- I can't agree with you the way you're

15    characterizing it.

16        Q.    Did you have access to any Schlumberger

17    confidential or privileged information regarding

18    technology development?

19        A.    Technology development?  I don't recall having

20    access.

21        Q.    Did you have any access to Schlumberger

22    confidential and privileged information regarding its

23    patent portfolio?

24        A.    As to the number of patents that my department

25    was filing, yes.
```

1    dad and me fishing.  They were pictures.

2         Q.    (BY MR. GRANT)   Is that the one you gave to your

3    lawyers?

4         A.    Yes.

5         Q.    Okay.  Did you attach that to any other computers

6    in between the time that you left Schlumberger or loaded

7    the information from your Schlumberger computer and gave

8    it to the lawyers in this case?

9         A.    Are you talking about the jump drive with my dad

10   and me fishing?

11        Q.    Yeah, that's the one I'm talking about.  That's

12   the one we're talking about right now.

13        A.    All right.  All right.  So can you ask that

14   question, again?

15        Q.    Sure.  From the time that you downloaded

16   information from your Schlumberger computer to that thumb

17   drive, from that time to the time that you gave it to the

18   lawyers representing you in this case, did you attach that

19   thumb drive to any other computers?

20        A.    I don't recall if I did.

21        Q.    So, to your knowledge, your best recollection, as

22   you sit here today, testifying under oath, is that you

23   can't recall attaching that thumb drive that your lawyers

24   got to any computer?

25        A.    I can't recall.

1      Q.   Okay.  Let's go to the third thumb drive.  Is

2  that the one -- let's -- there's two left, one with Acacia

3  information and one with Outlook and other things, right?

4      A.   All right.

5      Q.   Let's deal with the Acacia one next, okay?

6      A.   Okay.

7      Q.   You downloaded that Acacia press release and job

8  descriptions from your Schlumberger laptop to the thumb

9  drive, correct?

10     A.   I transferred the information over to the thumb

11 drive.

12     Q.   Did you draft those on your Schlumberger laptop?

13     A.   I think I may have drafted the press release on

14 my Schlumberger laptop.  The position descriptions, I

15 received from Acacia.

16     Q.   Can you speak up so we can make sure we can hear

17 your testimony.

18     A.   Uh-huh.  The position descriptions, I -- draft

19 position descriptions I got from Acacia based on other

20 descriptions they already had.

21     Q.   Okay.

22     A.   And I -- my plan was to modify them for my team.

23     Q.   So, you received the position descriptions for

24 the Energy Group -- or at least some of them at Acacia

25 while you were still working at Schlumberger?

1        A.   Yes, I believe it was after I gave notice and

2   before I left.

3        Q.   And did they e-mail them to you?  Is that how you

4   got them?

5        A.   I believe they went to my Google account, my

6   Gmail.

7        Q.   Did they e-mail them to you?

8        A.   Yes.

9        Q.   And did you download them on your Schlumberger

10  laptop to its hard drive?

11       A.   I believe I did.

12       Q.   In addition to the Acacia press release that you

13  drafted on your laptop, and the Acacia position

14  descriptions that you downloaded onto your laptop, was

15  there any other Acacia information that you had stored on

16  your Schlumberger laptop?

17       A.   There may have been a couple of Outlook contacts

18  with e-mails for people at Acacia.

19       Q.   Anything else?

20       A.   No, not that I recall.

21       Q.   Did you modify the position descriptions on your

22  Schlumberger laptop in any way?

23       A.   I can't recall.

24       Q.   Other than the files that we've just referenced,

25  was there anything else that you downloaded from your

1   Schlumberger laptop to what we're calling the third thumb

2   drive?

3       A.   So, the -- the -- talking about the third thumb

4   drive being the one with the Acacia press release and the

5   position descriptions?

6       Q.   The one we've been talking about.

7       A.   Well, I think I've already told you, on that

8   thumb drive or jump drive, I also downloaded some of my

9   personal information, like my financial information.

10      Q.   Okay.

11      A.   You recall I mentioned paychecks and stock

12  options and Schlumberger benefits.

13      Q.   Anything else?

14      A.   That's all I can recall.

15      Q.   Let's talk about the fourth thumb drive that you

16  attached to your Schlumberger computer in the time

17  immediately preceding your departure.

18              What did you download onto that from your

19  Schlumberger laptop?

20      A.   That jump drive I downloaded my Outlook contacts

21  and my iTunes.

22      Q.   Anything else?

23      A.   That's all I recall.

24      Q.   Where is the third thumb drive with the Acacia

25  information and some of your personal financial

1      Q.    What's your cable company?

2      A.    Comcast.

3      Q.    Comcast.  And when did he come to your home to

4   install your WiFi?

5      A.    I believe that was over Memorial Day weekend.  So

6   it would be that Friday, Saturday, Sunday, Monday, in that

7   time frame.

8      Q.    So, that's the weekend just prior to your

9   departure from Schlumberger?

10      A.    Yes, and after I had given notice.

11      Q.    Other than -- well, did anybody access your

12   computer, other than you, in the weeks immediately

13   preceding your departure from Schlumberger?

14      A.    Only me.

15      Q.    Okay.

16      A.    I don't think I asked Gary de Leon for any

17   assistance.

18      Q.    Okay.  So in the -- in the month of May, 2013,

19   the only person who was accessing your Schlumberger laptop

20   was you, correct?

21      A.    Again, my answer is, yes, unless Gary de Leon

22   helped me that month.  I often had PC problems, and he was

23   very helpful.  I don't recall if he helped me in May or

24   not.

25             (Exhibit No. 10 was marked.)

1      Q.   (BY MR. GRANT)   Okay.   We're handing you what's

2   been marked as Exhibit 10.   What's that, Ms. Rutherford?

3      A.   Appears to be a press announcement about Acacia

4   launching a Houston office and energy practice.

5      Q.   Well, who was the person responsible for that

6   launch?

7      A.   I was responsible for the launch of the Houston

8   office for Acacia.

9      Q.   Okay.   And Houston's -- rather -- strike that.

10          Acacia's ener-- energy practice is directed

11   from its Houston office, correct?

12      A.   It is today.

13      Q.   Has it ever been different from today?

14      A.   Yes.

15      Q.   When was -- when was Acacia's energy practice not

16   directed out of its Houston office?

17      A.   Before I joined Acacia.

18      Q.   So, at least since June 3rd, 2013, Acacia's

19   energy practice has been directed by you out of its

20   Houston office, correct?

21      A.   By me, and over time out of the Houston office.

22      Q.   And that's because you didn't have an office for

23   a while, it was just you -- were you working out of home

24   until they opened the office?

25      A.   No, we were office sharing with a law firm.

1        Q.   Which law firm?

2        A.   Williams Morgan.

3        Q.   Now, by the way, you said earlier that

4    Mr. Fischman, his reporting relationships changed several

5    weeks ago or in the last month.  When did he join Acacia,

6    approximately?

7        A.   He joined Acacia shortly after I did.

8        Q.   Okay.  Did you interview him?

9        A.   I did.

10       Q.   Did you make the decision to hire him?

11       A.   I made the recommendation to hire him.

12       Q.   Okay.  And he was, at that time when he first

13   joined Acacia, a direct report of yours, correct?

14       A.   He was.

15       Q.   And he remained a direct report at least through

16   about a month ago, correct?

17       A.   Again, he has a dual report.

18       Q.   Yeah, I understand.  And so -- but that dual

19   report is the last month?

20       A.   Roughly the last month --

21       Q.   Okay.

22       A.   -- or two.

23       Q.   Why did his reporting relationship change in the

24   last month or so?

25             MR. COLLINS:  I'm going to object to that.

1       Q.    Did they describe what responsibilities you would

2    be charged with should you be offered an acceptable --

3       A.    It was my understanding that Acacia's business

4    model is to acquire and license patents.  So, my

5    understanding is my job would be to acquire and license

6    patents in the energy space.

7       Q.    And I think we established this, but let's make

8    sure I got it clear.  You communicated, subsequent and

9    presumably before that face-to-face interview, with

10   Acacia, using your Schlumberger supplied laptop?

11      A.    I don't know if I used my Schlumberger laptop for

12   those communications or not.

13      Q.    Did you e-mail -- well, did you e-mail -- use any

14   other device for sending e-mails in the February to May,

15   2013, time frame?

16      A.    Could you repeat your question, please?

17      Q.    Did you use any other device, other than your

18   Schlumberger issued laptop, in the February to May, 2013,

19   time frame for sending e-mails?

20      A.    I had other devices to send e-mails besides my

21   Schlumberger laptop.

22      Q.    What were they?

23      A.    My iPad and my iPhone.

24      Q.    Before you joined Acacia, was there an energy

25   practice there?

1          A.   Yes.

2          Q.   Who was in charge of it?

3          A.   I'm not sure who was in charge.

4          Q.   Had it acquired any patents?

5          A.   I believe they had acquired at least one patent,

6     and I am aware that they were looking at other patents.

7          Q.   What materials did you provide to Acacia during

8     your interview and application process?

9          A.   I may have given them a copy of my resume.

10         Q.   Anything else?

11         A.   Not that I can recall.

12         Q.   Did you perform any work for or on behalf of

13    Acacia or any affiliate while -- well, prior to May 29,

14    2013?

15         A.   The only work that I did in connection with

16    Acacia, up until that time, was working on the press

17    release, which we've talked about, and the position

18    descriptions of the energy team.

19         Q.   When did you accept Acacia's offer to work there?

20         A.   On April 10, 2013.

21              (Conference out of the

22              hearing of the Reporter)

23         Q.   (BY MR. GRANT)  In your motion, the Exhibit 1

24    that we talked about, there's discussion about attorneys'

25    fees and your potential -- or arguable entitlement to

```
 1   attorneys' fees.  Who's paying the attorneys' fees

 2   associated with this case?

 3       A.    The attorney fees for the case by Schlumberger

 4   against me --

 5       Q.    This case.

 6       A.    -- is being paid by Acacia.

 7       Q.    Are you paying any of the fees or costs

 8   associated with this lawsuit?

 9       A.    No, I am not.

10       Q.    Have you been told that you will have any

11   obligation for fees or costs related to this lawsuit?

12             MR. AHMAD:  I'm going to object.  I think

13   that may be calling for a privileged matter, and I'll

14   instruct her not to answer.  I mean, I think you're

15   entitled to know where she's getting the money from or

16   who's paying it, but --

17             MR. GRANT:  Fair enough.  Let me rephrase it.

18       Q.    (BY MR. GRANT)  Do you have any obligation for

19   the fees and costs associated with this case, contingent

20   or otherwise?

21       A.    Not that I'm aware of.

22       Q.    How many times did you fly to California for

23   face-to-face interviews with Acacia personnel?

24       A.    Repeat your question, please.

25       Q.    How many times did you meet with Acacia personnel
```